**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| STACY PENNING, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN FAMILY MUTUAL INSURANCE COMPANY, S.I.,<br><br>Defendant. | Case No.: 26-cv-1092<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Stacy Penning ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his undersigned counsel, brings this Class Action Complaint against Defendant American Family Mutual Insurance Company, S.I. ("American Family" or "Defendant"). Plaintiff alleges the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiff, which are alleged upon personal knowledge.

## NATURE OF THE ACTION

1. The unauthorized collection and disclosure of a person's browsing activity, website interactions, personal identifiers, and device identifiers strikes at the most basic expectation of privacy in one's online life. The misconduct is especially egregious where, as here, a company affirmatively represents to users that they may control whether their data is sold, shared, or tracked, then secretly sells, shares, and tracks that data anyway.

2. Defendant American Family Mutual Insurance Company is one of the nation's leading property and casualty insurance providers. Since 1927, Defendant and its subsidiaries

have offered vehicle, home, commercial, and life insurance policies to consumers nationwide. Defendant additionally operates https://www.amfam.com (the "Website"), through which it markets and provides insurance products and services.[1]

3. The Website allows users to request new insurance quotes, review available coverage options and insurance products, purchase eligible policies, locate licensed insurance agents, and access customer-support resources. The Website also allows existing policyholders to view policy information, obtain insurance identification cards, make premium payments, manage billing arrangements, and report and track insurance claims.[2]

4. Like many modern websites, the Website displays a data privacy banner (the "Privacy Banner") and a cookie preferences interface (the "Cookie Settings") purporting to give users meaningful control over what data the Website shares with third parties. The Privacy Banner appears to afford users the choice between accepting and rejecting cookies, assuring those who opt to reject that their selection will be honored and their data will not be traced and sent to third parties.

5. Defendant's assurances are false. The Website begins placing and transmitting cookies and other third-party tracking technologies capable of transmitting users' data the moment users visit the Website, before they can interact with the Privacy Banner or select their preferences in the Cookie Settings.[3]

6. Embedded on the Website is tracking technology from third parties, including Meta, TikTok, Google, and Pinterest (collectively, the "Tracking Entities," and their tracking

---

[1] *See Auto, Home, Life and More*, AMERICAN FAMILY INSURANCE, https://www.amfam.com/ (last visited Oct. 27, 2026).
[2] *See id.*
[3] After receiving Plaintiffs' initial demand letter sent on July 22, 2026, Defendant appears to have stopped post-opt-out tracking from Reddit on some date shortly after.

technologies, the "Tracking Tools"). The Tracking Tools are designed to intercept users' communications with the Website and to disclose the contents of those communications to the Tracking Entities. Here, the Tracking Tools do so without users' knowledge or consent.

7. The Tracking Tools collect detailed interaction and behavioral data, including users' selections of links, buttons, forms, and other on-page elements, as well as information entered into search fields. This data includes: webpages and products viewed or purchased; inferred interests, preferences, age, location, and other characteristics based on users' behavior and content engagement; personal, device, and technical identifiers such as device type, operating system, and browser type; persistent identifiers, often contained within "cookies," that enable recognition of users across sessions and websites on the internet utilizing the same Tracking Tools; personal identifiers that associate users with individual profiles; and approximate geolocation information derived from IP addresses or similar signals. Collectively, this information is referred to herein as "Sensitive Information," and it is collected the moment a user arrives on the Website.

8. By misrepresenting both the effectiveness of its tracking mechanism and users' ability to decline consent, Defendant deprives users of any real control over their Sensitive Information and their privacy.

9. Accordingly, Plaintiff and Website users have been harmed by Defendant's misrepresentations and tracking and data sharing practices. Plaintiff brings this action, and the claims set forth herein, on behalf of himself and a putative class of similarly situated persons harmed by Defendant's deceptive and unlawful surveillance practices.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a)-(e). This Court has supplemental jurisdiction over the non-federal claims in this action. This Court also has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is more than 100, and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendant's citizenship. Defendant is a citizen of the State of Wisconsin and of the state of its principal place of business in Madison, Wisconsin. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

11. This Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business in this District.

12. Venue is proper in this Court because Defendant's principal place of business is located in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## PARTIES

13. Plaintiff Stacy Penning is, and at all relevant times has been, a citizen of the State of California. Plaintiff accessed and used Defendant's Website while physically located in California. Plaintiff maintains an account with Facebook, and his account contains his identifying information, and he was logged into his account when he accessed the Website.

14. Defendant American Family Mutual Insurance Company, S.I. is a Wisconsin stock property and casualty insurance company with its principal place of business in Madison,

Wisconsin.[4] Defendant owns and operates the Website.

## FACTUAL ALLEGATIONS

### I. Plaintiff's Experience On The Website

15. Plaintiff visited Defendant's Website in or around June and July of 2026 and used the Website to research automobile insurance and home insurance quotes. Specifically, Plaintiff looked at various sections of "Insurance" and navigated between subsections of "Home" and "Auto" on the Website. Plaintiff does not maintain an existing account with Defendant's Website. In connection with his June 2026 visit to Defendant's Website, Plaintiff was presented with the Website's Privacy Banner. Plaintiff affirmatively rejected all but strictly necessary cookies by clicking "Reject Cookies" in the Privacy Banner, relying on Defendant's representations that doing so would disable non-essential advertising, analytics, and tracking technologies.

16. Plaintiff reasonably believed that his activity on the Website would not be tracked beyond what was strictly necessary for the Website's basic functionality. Furthermore, had Plaintiff known he could not rely on Defendant's representations and that his Sensitive Information would be intercepted and sold/shared regardless of his affirmative rejection, he would not have used the Website.

### II. How Websites Function

17. Websites are hosted on servers, meaning their files are stored on and accessed from those servers. Websites are also "run" in part on a user's internet browser, as the browser loads and processes the website's code to display the webpage.

---

[4] *See Underwriting Companies*, AMERICAN FAMILY INSURANCE, https://www.amfam.com/underwriting-companies (last visited Nov. 2, 2026).

18. When a user navigates to a webpage, by entering a URL directly or clicking a hyperlink, that user's browser contacts a Domain Name System ("DNS") server, which translates the website's web address into a unique Internet Protocol ("IP") address.[5]

19. An IP address is "a unique address that identifies a device on the internet or a local network."[6]

20. When a user's browser navigates to a webpage, it sends an HTTP request to the server identified by that IP address (the "Request URL").

21. The Request URL includes a domain name and path, which identify the specific content being accessed and its location within the website's structure. The Request URL typically contains parameters, values appended to a URL to transmit data to the recipient, prefaced by a question mark to signal their use, which direct the web server to provide additional, context-sensitive content.

22. By viewing a URL, an ordinary person can read these parameters and determine what choices a user made on a website, including the products or articles viewed, the phrases searched, and the substance of the user's communications with the website.

23. Website owners and web developers write and manage the URLs for their websites.

24. After the Request URL is sent and the server responds, the user's browser assembles the packets sent by the server back into the HTML code of the webpage. That code is

---

[5] *See How the Web Works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited Nov. 2, 2026).

[6] *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited Nov. 2, 2026).

processed by the browser as it arrives[7] and rendered into the visual display according to the HTML's instructions, the visible, and usually interactive, website that most people think of.[8]

25. To provide more complex functionality, website developers embed commands written in other programming languages, such as JavaScript, within the HTML documents.[9] Such code is used, among other things, to monitor and report users' activity. This code intercepts users' communications while they are in transit to a website, while a URL is being requested, and duplicates those requests, transmitting them to a first- or third-party server.

26. In short, the Internet relies on a constant, real-time exchange of requests and responses between a user's browser and a website's stored code and data. Critically, these requests and responses provide a near-complete record of everything a user does, and does not do, on a website, when and how they do it, and with what software and hardware.

## III. Defendant Programmed the Website To Include Tracking Tools

27. Defendant voluntarily integrated Tracking Tools into its Website's programming. Defendant's use of such Tracking Tools on its Website is performed pursuant to commercial agreements between Defendant and the Tracking Entities. These commercial agreements are formed to provide a commercial benefit to both the Defendant and the Tracking Entities.

---

[7] This processing of webpage data as it arrives is called "parsing," and allows web browsers to convert raw data received over the internet into structured data objects used by the renderer built into the browser to create images on the screen. In short, unless a software command, like a Tracking Tool, is physically last to arrive at a device, it is loaded and executed before the communication has finished being received. *See Populating the Page: How Browsers Work*, MOZILLA, https://developer.mozilla.org/en-US/docs/Web/Performance/Guides/How_browsers_work (last visited Nov. 2, 2026).

[8] *See What Is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Nov. 2, 2026).

[9] *See JavaScript: Adding Interactivity*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited Nov. 2, 2026).

28. The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website's server to a user's web browser and stored locally on the user's device. Cookies typically contain unique identifiers that enable a website to recognize and differentiate individual users. These cookie files are automatically transmitted back to web servers through HTTP requests, allowing the Website and Tracking Entities to identify the device making the request and to record a session reflecting how the user interacts with the Website, i.e., everything they view, click on, type, search for or even hover over.

29. First-party cookies are those placed directly on the user's device by the web server with which the user is knowingly communicating, in this case, Defendant's Website. First-party cookies are commonly used to recognize users across repeated visits to the same website and to track their on-site activity.

30. Third-party cookies are placed by domains other than the Website's domain, such as advertising or analytics domains. These third-party cookies contain unique identifiers that allow Tracking Entities to recognize and track individual users across different websites, including the Website, and across multiple browsing sessions.

31. As detailed further below, Tracking Tools, including first- and third-party cookies, that are placed on users' devices during interactions with the Website are subsequently used to intercept and record users' communications by the Tracking Entities, enabling them to surreptitiously track and collect Website users' Sensitive Information in real time.

32. Tracking Tools serve numerous commercial purposes, including: (i) analytics, such as measuring user engagement and Website performance; (ii) personalization, including

remembering users' preferences; (iii) advertising and targeting, including delivering targeted or behavioral advertisements based on users' profiles; and (iv) social media integration.

33. The Tracking Entities use the Sensitive Information collected from users like Plaintiff to build detailed profiles of users, thereby enhancing the effectiveness and efficiency of the Tracking Entities' and Defendant's marketing efforts.

34. Because Defendant controls the Website's software code and determines which Tracking Tools are loaded onto users' browsers, Defendant has control over whether these Tracking Tools are placed and whether users' Sensitive Information is transmitted to Tracking Entities.

## IV. The Website Misrepresented that Users Could Control the Collection and Disclosure of Their Sensitive Information

35. When users visited the Website, Defendant immediately displayed a Privacy Banner stating: "We use cookies and similar tracking technologies for site features, analytics, and advertisements as set forth in our Cookie Policy and Privacy Notice. Use Manage Preferences for more information and to adjust your settings." The Privacy Banner offered users the options to "Accept Cookies," "Reject Cookies," or "Manage Preferences," representing to users that they could make material choices about which tools the Website used and how their data was shared with third parties.

36. When a user, like Plaintiff, clicked the "Reject Cookies" button, the Privacy Banner disappeared from view.




*Figure 1 – The Privacy Banner on the Website*

37. Website users who selected the “Manage Preferences” option on the Privacy Banner were presented with the Cookie Settings. The Cookie Settings allowed users to toggle off “Analytics Cookies” and “Advertising Cookies” and click “Confirm My Choices” to reject all nonessential cookies.




*Figure 2 – The Cookie Settings on the Website*

38. Defendant's Cookie Settings state that:

> Under the California Consumer Privacy Act ("CCPA"), California consumers have the right to opt-out of the sale or sharing of personal information to third parties. When you visit our website, we store cookies on your browser to collect information. The information collected might relate to you, your preferences or your device, and is mostly used to make the site work as you expect it to and to provide a more personalized web experience. However, you can choose not to allow certain types of cookies, which may impact your experience of the site and

> the services we are able to offer. You cannot opt-out of our First Party Strictly Necessary Cookies as they are deployed in order to ensure the proper functioning of our website (such as prompting the cookie banner and remembering your settings, to log into your account, to redirect you when you log out, etc.). Our use of certain types of cookies or other tracking technologies may be deemed a "sharing" of Personal Information. (In this context, "sharing" means cross-contextual behavioral advertising). You can opt-out of the sharing of your Personal Information and our use of certain types of tracking technologies and cookies by managing your preferences. If you opt-out, your Personal Information will not be shared to offer you personalized ads according to your preferences. Please note: We do not sell your personal information. Click on the different category headings to find out more and change our default settings according to your preference. For more information about the First and Third Party Cookies used please follow this link.

39. The Cookie Settings further represent that "Advertising" cookies are used to serve advertising content:

> Advertising Cookies
>
> Advertising cookies may be placed by us or third parties to enable third party ad networks to recognize a unique cookie on your computer or mobile device. The information that is collected and shared by these types of cookies may also be linked to the device identifier of the device you are using to allow us to keep track of all the websites you have visited that are associated with the ad network. This information may be used for the purpose of targeting advertisements on our website and third-party sites based on those interests

40. The Cookie Settings further represent that "Analytics" cookies are to gain information about visitor behavior:

> Analytics Cookies
>
> Analytics cookies provide us with information regarding how visitors navigate and interact with our website. Such cookies allow us to understand, for example, more about how many visitors we have to our website, how many times they visit us and how many times a user viewed specific pages within our website. Among other Analytics cookies, we use Google Analytics cookies for these purposes. For more information about Google Analytics, please refer to "How Google Uses Information From Sites or Apps that Use Our Services," which can be found at www.google.com/policies/privacy/partners/ or any other URL Google may provide from time to time.

41. Defendant's representations in the Privacy Banner and Cookie Settings led Plaintiff, and would reasonably lead all Website users similarly situated, to believe that they had disabled all but essential cookies via their express rejection. The Privacy Banner and Cookie Settings further reasonably led Plaintiff, and would reasonably lead all other reasonable Website users, to believe that Defendant would not allow Tracking Entities, through cookies or similar technologies, to access users' Sensitive Information.

42. Defendant disregarded Plaintiff's expressed preferences, as it disregards those of all users. By clicking "Reject Cookies" or otherwise rejecting all nonessential cookies, users clearly communicate that they do not consent to the placement or transmission of nonessential cookies. Nevertheless, after users made that choice, Defendant continued to deploy the Meta Pixel, the TikTok Pixel, Google Ads, and the Pinterest Tag, and to place or access cookies on users' browsers and devices falling within Defendant's own "Advertising Cookies" and "Analytics Cookies" categories, so that the Tracking Entities could intercept, transmit, and use users' Sensitive Information in real time.

## V. Defendant's Website Uses Tracking Tools

43. The Tracking Tools function by intercepting users' communications, including Plaintiff's Sensitive Information, in transit when they take certain actions on the Website. These actions include when they click on a link, make a search, view a quote, or load any page on the Website.

44. The Tracking Tools use cookies and other identifiers to identify users, including Plaintiff, when they visit the Website. The cookies allow the Tracking Entities to identify users, including Plaintiff, when they visit the Website or any other website where the Tracking Tools are present.

45. The Tracking Tools allow Defendant and the Tracking Entities to materially benefit from Plaintiff's Sensitive Information. Defendant uses Plaintiff's Sensitive Information to improve their marketing and advertising, while the Tracking Entities use Plaintiff's Sensitive Information for marketing and advertising on the Website and other third-party websites, improve their own services, and build personal profiles to advertise to users, including Plaintiff.

## VI. The Meta Pixel

46. Meta offers its own tracking pixel known as the Meta Pixel (the "Meta Pixel") to website owners for the purpose of monitoring user interactions on their websites, which can then be shared with Meta.

47. The Meta Pixel is a marketing tool that can only be added to a webpage by website developers.[10] A website operator must sign up for a business account or link a related Facebook account with its Pixel and then add code to the website to make use of the Meta Pixel.[11]

48. Upon creating a Meta Pixel, a Pixel ID (also called a DataSet ID by Meta) is generated.[12] This Pixel ID is used to initialize the Meta Pixel, either by allowing Meta to fetch a predetermined library of code related to that ID, or otherwise by identifying the website owner's Facebook account used to receive the collected data when programming the Pixel directly into a website.[13]

---

[10] *See Set Up and Install the Meta Pixel*, META, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited Nov. 2, 2026).

[11] *See id.*

[12] *See Get Started with the Meta Pixel*, META (updated June 30, 2026) https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Nov. 2, 2026).

[13] *See id.* ("To install the Pixel, we highly recommend that you add its base code… on every page where you will be tracking website visitor actions.").

49. This Pixel ID must match a known Pixel ID in Meta's system, and is transmitted by the Meta Pixel.[14]

50. As Meta notes, the Meta Pixel must be added to each individual page that a website owner wishes to be tracked.[15]

51. Defendant placed the Meta Pixel on the Website to gather, collect, and then transmit user information to Meta.[16] Defendant and Meta use this information to build valuable personal profiles for Website users to inform their targeted advertising campaigns, enhancing marketing effectiveness and increasing the chance of converting users into paying customers.[17] Defendant directly benefits from the use of the Meta Pixel by using these profiles for advertising.

52. The harvested data improves Defendant's advertising by pinpointing audience demographics by interests, gender, or location, and finding the people who are most likely to take action and view content.[18]

53. Once implemented on a website, the Meta Pixel begins to share users' information the moment a user lands on the website.

54. When a Facebook user logs onto Facebook, tracking cookies, including the "c_user" cookie, the "datr" cookie, and the "fr" cookie, are automatically created and stored on

---

[14] *See id.*

[15] *See id.* ("To install the Pixel, we highly recommend that you add its base code… on every page where you will be tracking website visitor actions.").

[16] *See id.* The Meta Pixel allows websites to track visitor activity by monitoring user actions ("events") that websites want tracked and to share a tracked user's data with Meta. *See Specifications for Meta Pixel Standard Events*, META, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Nov. 2, 2026).

[17] *See Meta Pixel*, META (last updated Nov. 15, 2023) https://developers.facebook.com/docs/meta-pixel/ (last visited Oct. 27, 2026).

[18] *See Meta Advantage+ Audience: Target Ad Campaigns with AI*, META, https://www.facebook.com/business/ads/meta-advantage-plus/audience (last visited Nov. 2, 2026).

the user's device.[19] These cookies allow Meta to link the data it receives through the Meta Pixel to individual Facebook users.

55. The c_user cookie, for example, contains a series of numbers (the user's Facebook ID, or "FID") to identify a user's profile.




*Figure 4 – Sample c_user cookie, containing FID of test account created by Plaintiff's counsel to investigate the Meta Pixel*

56. The FID can simply be appended to www.facebook.com/ to navigate to the user's profile (e.g., www.facebook.com/[FID]). Appending the FID from *Figure 4* to the Facebook URL in a standard internet browser (here, www.facebook.com/100091959850832) redirects the webpage straight to the Facebook profile associated with the UID, as depicted below:




*Figure 5 – Sample Facebook account created by Plaintiff's counsel to investigate the Meta Pixel, with FID highlighted in URL*

[19] *See Cookies Policy: What Are Cookies, and What Does This Policy Cover?*, META (last updated Dec. 12, 2023) https://www.facebook.com/policy/cookies/ (last visited Nov. 2, 2026).

57. The Meta Pixel tracks user activity on web pages by monitoring events,[20] which, when triggered, automatically sends data, namely users' Sensitive Information, directly to Meta.[21] An example of an event utilized by websites is one that triggers when a user loads a page with a Meta Pixel installed (the "PageView event").[22] The Website utilizes the PageView event.[23]

58. The Meta Pixel also transmits Defendant's unique Pixel ID via the "id" parameter, which contains Defendant's Pixel ID of "2072972649428449" for the purpose of matching the harvested data to Defendant's Website.

59. Meta independently benefits from the data collected through the Meta Pixel by using the harvested data to sell targeted advertising services. Meta benefits from intercepting and analyzing users' Sensitive Information by refining its marketing algorithms and improving the effectiveness of its ad sales to all advertisers through Meta's social media platforms to target Meta's users, profiting from the ability to more accurately target potential customers.

60. Meta admits that it shares users' Sensitive Information with third parties,[24] just as Plaintiff's Sensitive Information was shared here.

---

[20] *See About Meta Pixel*, META, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Nov. 2, 2026).

[21] *See id.*

[22] *See Specifications for Meta Pixel Standard Events*, META, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Nov. 2, 2026).

[23] The presence of Pixel events can be confirmed by using the publicly available and free Meta Pixel Helper tool. *See About Meta Ads Data Advisor*, META, https://www.facebook.com/business/help/198406697184603?id=1205376682832142 (last visited Nov. 2, 2026).

[24] *See Privacy Policy*, META (last updated July 23, 2026), https://www.facebook.com/privacy/policy?section_id=4-HowDoWeShare (last visited Nov. 2, 2026).

61. Defendant's use of the Meta Pixel on the Website is demonstrated by the screenshots below:




*Figure 6 – The Meta Pixel intercepting user communications on the Website through the "PageView" event*



*Figure 7 – Information captured by the Meta Pixel intercepting user communications on the Website through the "PageView" event*




*Figure 8 – Cookies transmitted by the Meta Pixel on the Website*

62. When a business applies to use the Meta Pixel, it is provided with details about its functionality and its impact on private information.[25] Plaintiff and Website users, however, are not provided with this information and would have no reason to look for it, as they are not a party to Defendant's agreement with Meta.

63. To make use of the Meta Pixel, Defendant agreed to Meta's Business Tools Terms (the "Meta Terms").

[25] *See Get Started with the Meta Pixel*, *supra* note 12 (The Pixel "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts. Once matched, we can tally their actions in the Facebook Ads Manager so you can use the data…. By default, the Pixel will track URLs visited, domains visited, and the devices your visitors use.").

64. The Meta Terms inform website owners using the Meta Pixel that the employment of the Meta Pixel will result in data sharing, including with Meta, through the automatic sharing of Pixel Event information and contact information.[26]

65. The Meta Terms are transparent that Meta will use the Pixel Event information and contact information "to match the Contact Information against user IDs…, as well as to combine those user IDs with corresponding [Pixel Event information]."[27]

66. Meta directs parties implementing the Meta Pixel, here, Defendant, to encrypt request information[28] before data can be shared.[29]

67. Meta further provides Meta Pixel users, such as Defendant, guidance on responsible data handling and details how data is acquired, used, and stored, including which information is shared with Meta.

68. Meta educates or reminds Meta Pixel users of their responsibility to inform their users of their website's data sharing and specifically guides website owners to obtain the requisite rights, permissions, or consents before sharing information with any third party.[30]

69. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Meta Pixel and ignored Meta's warnings to safely handle its users' data and to

---

[26] *See Meta Business Tools Terms*, FACEBOOK (Nov. 3, 2025) https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited Nov. 2, 2026).
[27] *Id.*
[28] This contrasts with Meta's JavaScript Pixel, which automatically encrypts the data being sent. *See id.*
[29] *See id.*
[30] *See Privacy and Data Use Requirements for Meta Business Tools*, META, https://www.facebook.com/business/help/363303621411154?id=818859032317965 (last visited Nov. 2, 2026).

warn its users that the Website would disclose information in a manner that threatened users' private information.

## VII. The TikTok Pixel

70. TikTok offers software known as a "tracking pixel" to track users' actions, behavior, and conversions across the Website (the "TikTok Pixel").

71. The TikTok Pixel is a snippet of code that begins to collect information the moment a user lands on the Website. To use the TikTok Pixel, the website operators, including Defendant, must include the specific pixel IDs associated with their websites, which allows TikTok to link the intercepted data back to their individual TikTok business profiles.[31]

72. Defendant's TikTok Pixel ID is CH00DCBC77U442B6S5NG and is included in transmissions sent to and from users' devices.

73. TikTok Pixel users make use of events to collect even more specific data on users' activities, including for the actions taken on a webpage (e.g., clicking a specific button or element, adding an item to a cart, and when a webpage with a URL containing a specified keyword is loaded onto a user's browser), the value of the purchase, and the product purchased.[32]

74. These event-triggers cause data to be sent as communications are received by users (through webpage loading events), and as communications are sent to the Website (through button clicking and similar events).

---

[31] *See generally Troubleshoot with Pixel Helper*, TIKTOK (last updated Feb. 2025) https://ads.tiktok.com/help/article/tiktok-pixel-helper-2.0?lang=en (last visited Nov. 2, 2026) (noting that a missing or invalid Pixel ID will cause errors when using the TikTok Pixel).

[32] *See generally About TikTok Pixel*, TIKTOK (last updated June 2026) https://ads.tiktok.com/resources/help/article/tiktok-pixel?lang=en (last visited Nov. 2, 2026); *Troubleshoot with Pixel Helper*, *supra* note 31. S).

75. The TikTok Pixel also collects:

a. The time website actions took place;

b. The IP address (which is used to determine the geographic location of a user);

c. Device information, including make, model, operating system, and browser information;

d. Cookies that can be used to identify users; and

e. Metadata and button clicks.[33]

76. The information the TikTok Pixel collects provides Defendant and TikTok with a better understanding of who Defendant's customers are, which webpages users have visited, and how they interact with the Website.

77. TikTok's "Advanced Matching" feature allows Defendant to "match customer information such as email, phone number, and other identifiers with actions people take on [the Website]."[34] Once Advanced Matching is active, the TikTok Pixel "will automatically find customer information and match it with people on TikTok."[35] TikTok then provides Defendant with custom audiences based on website user events, like page views or purchases, to model lookalike audiences.[36] Lookalike audiences allow Defendant to retarget users who have already

---

[33] *See About TikTok Pixel*, *supra* note32.

[34] *About Advanced Matching for Web*, TIKTOK (last updated Sept. 2025) https://ads.tiktok.com/help/article/advanced-matching-web?lang=en (last visited Nov. 2, 2026).

[35] *How to Set Up Automatic Advanced Matching*, TIKTOK (last updated Nov. 2025) https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en (last visited Nov. 2, 2026).

[36] *See Get Started with the TikTok Pixel: A Small Business Guide*, TIKTOK, https://ads.tiktok.com/business/en-US/blog/get-started-with-tiktok-pixel (last visited Nov. 2, 2026) (benefits of using the TikTok Pixel).

visited or made purchases on the Website and serve them with relevant ads on TikTok based on how they interacted with the Website.[37]

78. Put simply, the TikTok Pixel collects as much data as it can about otherwise anonymous visitors to the Website and matches it with existing data TikTok has acquired and accumulated about millions of TikTok users to identify users and develop their marketing profiles, improving Defendant's conversion rates and reducing overall advertising costs.[38]

79. Defendant used the TikTok Pixel to monitor and log, in real time from users' browsers, when users loaded webpages or made searches.

80. The TikTok Pixel also captures users' identifying cookies (the _ttp cookie is used to identify TikTok users).[39]

81. Using the TikTok Pixel benefits Defendant by allowing Defendant to effectively track conversions, optimize the delivery of its ad campaigns, create and target its own custom audiences, and create and access vast amounts of data to run successful ad campaigns.[40]

82. TikTok benefits, in turn, by using data collected by the TikTok Pixel to improve its own products and services, including the sale of targeted advertising, and to generate its own benchmarking reports to share with other TikTok business customers.[41]

---

[37] *See* Lizzie Davey, *How to Use TikTok Pixel: TikTok Conversions Tracking*, LEADSBRIDGE (May 2, 2025), https://leadsbridge.com/blog/tiktok-pixel/ (last visited Nov. 2, 2026).
[38] *See id.*
[39] *See List of Cookies*, G-STAR RAW 13 (March 2023) https://assets.g-star.com/v1/static/Cookielist_Jun_2022#:~:text=Tiktok%20tta_attr_id.%2012%20months%20This%20cookie%20is,measure%20how%20different%20campaigns%20and%20marketing%20strategies (last visited Nov. 2, 2026).
[40] *See Get Started with the TikTok Pixel: A Small Business Guide*, *supra* note 36.
[41] *See TikTok Business Products (Data) Terms*, TIKTOK (last updated Jan. 22, 2026) http://ads.tiktok.com/i18n/official/policy/business-products-terms (last visited Nov. 2, 2026).

83. In fact, TikTok admits that it gathers Website visitors' Sensitive Information via the TikTok Pixel and shares that Sensitive Information with third parties,[42] just as Plaintiff's Sensitive Information was gathered and shared here.

84. According to a leading data security firm, the TikTok Pixel secretly installed on Defendant's Website is particularly invasive. The TikTok Pixel "immediately link[s] to data harvesting platforms that pick off usernames and passwords, credit card and banking information and details about users' personal health."[43] The TikTok Pixel also collects "names, passwords and authentication codes" and "transfer[s] the data to locations around the globe," and does so "often before users have a chance to accept cookies or otherwise grant consent."[44]

85. An image of the invasive TikTok code secretly embedded on Defendant's Website can be seen here, which shows the Website instantly sending communications to TikTok to add to its collection of user behavior:

---

[42] *See* *Privacy Policy*, TIKTOK (last updated July 15, 2026) https://www.tiktok.com/legal/page/us/privacy-policy/en (last visited Nov. 2, 2026).

[43] *See* Aaron Katersky, *TikTok Has Your Data Even If You've Never Used The App: Report*, ABC NEWS (Mar. 16, 2023, 1:59 PM) https://abcnews.go.com/Business/tiktok-data-app-report/story?id=97913249 (last visited Nov. 2, 2026).

[44] *Id.*




*Figure 9 – Using a browser's "developer tools" shows the Website loading TikTok Pixel's code onto the user's browser*




*Figure 10 – Defendant's TikTok Pixel code on the Website displaying the active features of the TikTok Pixel on the Website, including Advanced Matching and AutoAdvancedMatching*

86. The TikTok Pixel instantly sends communications to TikTok when a user views the page and tracks page interactions. The screenshots below show TikTok capturing users' communications on the Website:



*Figure 11 – The TikTok Pixel intercepting a user's communications on the Website*




*Figure 12 – Information captured by the TikTok Pixel intercepting a user's communications on the Website*




*Figure 13 – Sample Search page on the website*




*Figure 14 – Information captured by the TikTok Pixel intercepting a user's Search communications on the website*




*Figure 15 – Cookies transmitted by the TikTok Pixel tracking a user's communications on the Website*

87. To use the TikTok Pixel, Defendant agreed to TikTok's Business Products (Data) Terms (the "TikTok Terms"). But Plaintiff and other Website visitors are never exposed to these terms (nor would they have any reason to look for them) as they form the agreement between Defendant and TikTok, which agreement is not even known to Plaintiff and Website visitors.

88. The TikTok Terms inform website owners using TikTok Pixel that their use of the TikTok Pixel shares or enables TikTok to access their website users' contact details, developer data, and/or event data.[45]

89. The TikTok Terms are transparent that TikTok will process users' data to match contact details against corresponding accounts and subsequently match those accounts with the users' corresponding event data.[46]

90. TikTok puts TikTok Pixel users, such as Defendant, on notice that they "must only share with us or enable us to access Business Products Data in a manner that is transparent and

[45] *See TikTok Business Products (Data) Terms*, *supra* note 41.
[46] *See id.*

lawful."[47] TikTok makes clear that the onus is on Defendant to provide all necessary transparency notices, and obtain all necessary rights, permissions, and lawful bases, including consent, to share information with TikTok.

91. TikTok educates and reminds TikTok Pixel users of their obligation not to share any data "from or about Children or that includes health or financial information, or other categories of sensitive information."[48]

92. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the TikTok Pixel and ignored TikTok's warnings to safely handle its users' data and warn their users that the Website would disclose their Sensitive Information.

## VIII. Google Ads

93. Google Ads, formerly AdWords, is an advertising platform developed by Google that allows advertisers to bid to display advertisements, service offerings, product listings, or videos to web users.[49]

94. The process for advertisers using Google Ads to display ads within Google search results is as follows: (i) advertisers create text-based ads with a title, description, and a link to the website to place within the Google search results; (ii) advertisers then choose keywords, usually related to their business or target audience, intended to trigger their ads to appear within the user's search results; (iii) Google then allows advertisers to bid on those various keywords; (iv) the advertiser with the best Ad rank wins the auction, and the ad is displayed on the search results

---

[47] *Id.*
[48] *Id.*
[49] *See Achieve All Your Ad Goals in One Place*, GOOGLE, https://ads.google.com/home/goals/ (last visited Nov. 2, 2026).

page; and (v) the winning ad appears above or below the organic search results and is marked as an ad.[50]

95. Google Ads intercepted Plaintiff's Website activity, as depicted below. This interception occurred through users' browsers as communications were sent and/or received on users' devices.




*Figure 16 – Google PageAd intercepting a user's communications with the Website*

---

[50] *See How to Set Up Google Ads: A Checklist*, GOOGLE (Mar. 2023) https://business.google.com/us/resources/articles/how-to-setup-google-ads-a-checklist/ (last visited Nov. 2, 2026).




*Figure 17 – Information captured by the Google PageAd intercepting a user's communications with the Website*




*Figure 18 – Cookies transmitted by Google PageAd capturing a user's communications with the Website*




*Figure 19 – Google PageAd tracking a user's Search communications on the Website*




*Figure 20 – Payload of Google PageAd tracking a user's Search communications on the Website*




*Figure 21 – Cookies placed by and received by Google PageAd on the Website's search page*




*Figure 22 – Google Analytics tracking a user's Search communications on the Website*




*Figure 23 – Payload of Google Analytics tracking a user's Search communications on the Website*




*Figure 24 – Cookies of Google Analytics tracking a user's Search communications on the Website*

96. Google uses the NID cookie to identify users on the Website.[51] This allows them to match the intercepted communications with a specific user.

## IX. Google Analytics

97. Defendant embeds Google Analytics in its Website to enable Google to intercept users' Sensitive Information.

98. Google Analytics ("GA") invisibly collects data about user interactions with a website, including link clicks, button clicks, form submissions, conversions, shopping cart abandonment, adding items to carts, removing items from carts, file downloads, scrolling behavior, video views, call to action performance, table of contents clicks, and other customizable events.

---

[51] *See Privacy & Terms: How Google Uses Cookies*, GOOGLE, https://policies.google.com/technologies/cookies?hl=en-US (last visited Nov. 2, 2026).

99. Google admits that it shares users' Sensitive Information with third parties,[52] just as Plaintiff's Sensitive Information was shared here.

100. The data collected through GA is sent back to Google, which associates the activity with the website from which it was collected. Notably, Google notifies web developers that they should provide users with "clear and comprehensive information about . . . the storing and accessing of cookies or other information on the User's device where such activity occurs in connection with the Service and where providing such information and obtaining such consent is required by law."[53]

101. In short, the use of GA involves specific data-collection practices, preconfigured settings, and known transmission paths for user data. Google acknowledges the legal risks associated with its tracking tools and explicitly shifts the responsibility for informing users and obtaining any required consent onto website operators like Defendant.

102. Here, Defendant added GA to its Website by (1) creating an Analytics account; (2) designating their Website as a property; (3) adding a data stream to determine what information to collect; and (4) adding GA to its website.

---

[52] *See Privacy & Terms*, GOOGLE, https://policies.google.com/privacy?hl=en#infosharing (last visited Nov. 2, 2026).

[53] *Google Analytics Terms of Service*, GOOGLE (last updated May 15, 2023) https://marketingplatform.google.com/about/analytics/terms/us/ (last visited Nov. 2, 2026).

103. Defendant's use of GA on the Website is shown in the screenshots below:



*Figure 17 – Google Analytics intercepting a user's communications with the Website*




*Figure 18 – Information captured by Google Analytics intercepting a user's communications with the Website*




*Figure 19 – Cookies transmitted by Google Analytics capturing a user's communications with the Website*

104. Google provides analysis and feedback, which helps Defendant monetize the collected information through targeted advertising.

105. On December 19, 2024, Google announced that organizations using its advertising products can use fingerprinting techniques beginning on February 16, 2025.[54]

106. "Fingerprinting involves the collection of pieces of information about a device's software or hardware, which, when combined, can uniquely identify a particular device and user," explained Stephen Almond, executive director of regulatory risk at the United Kingdom's Information Commissioner's Office (the "ICO").[55]

---

[54] *See* Pieter Arntz, *Google Now Allows Digital Fingerprinting of Its Users*, MALWAREBYTES (Feb. 19, 2025) https://www.malwarebytes.com/blog/news/2025/02/google-now-allows-digital-fingerprinting-of-its-users (last visited Nov. 2, 2026).

[55] Stephen Almond, *Our Response to Google's Policy Change on Fingerprinting*, INFORMATION COMMISSIONER'S OFFICE (Dec. 19, 2024) https://ico.org.uk/about-the-ico/media-centre/news-and-blogs/2024/12/our-response-to-google-s-policy-change-on-fingerprinting/ (last visited Nov. 2, 2026).

107. Digital fingerprinting essentially creates a unique digital ID for a user and their device based on various pieces of information collected when users browse the internet, including a user's operating system (e.g., Windows, Android, iOS), browser type (e.g., Chrome, Safari, Firefox) and version, IP address, installed browser plugins, time zone, and language settings, among others.[56]

108. In addition to device identifiers, fingerprinting collects all the websites and apps the user uses, creating a detailed map for Google to follow and analyze, enabling a profile to be built of everything a consumer likes and is likely to buy.[57]

109. Even Google has raised concerns about digital fingerprinting in the past, warning it "subverts user choice and is wrong."[58]

110. In changing its policy regarding fingerprinting, Google vaguely claims it is investing in privacy-enhancing technologies (PETs) to protect users' privacy, providing few specifics about how PETs do so.[59]

111. The ICO finds fingerprinting an unfair means of tracking users online, "because it is likely to reduce people's choice and control over how their information is collected."[60]

112. The ICO explains:

> [W]hen you choose an option on a consent banner or 'clear all site data' in your browser, you are generally controlling the use of cookies and other traditional

[56] *See* Arntz, *supra* note 54.
[57] *See* Zak Doffman, *Google's Fingerprinting Returns in 8 Weeks and It Will Track Your Devices*, FORBES (last updated Jan. 8, 2025, 12:21 PM) https://www.forbes.com/sites/zakdoffman/2024/12/21/forget-chrome-google-will-start-tracking-you-and-all-your-smart-devices-in-8-weeks/ (last visited Nov. 2, 2026); *see also* Zak Doffman, *Google Starts Fingerprinting Your Devices in 10 Days*, FORBES (last updated Feb. 18, 2025, 12:54 AM), https://www.forbes.com/sites/zakdoffman/2025/02/08/forget-chrome-google-starts-tracking-all-your-devices-in-10-days/ (last visited Nov. 2, 2026).
[58] Doffman, *Google Starts Fingerprinting Your Devices in 10 Days*, *supra* note 57.
[59] *See id.*
[60] *See* Almond, *supra* note 55.

> forms of local storage. Fingerprinting, however, relies on signals that you cannot easily wipe. So, even if you 'clear all site data', the organisation using fingerprinting techniques could immediately identify you again.[61]

113. As a result of Defendant's use of Google's GA tool, users, including Plaintiff, lost control of their Sensitive Information and had marketing profiles developed through the use of their Sensitive Information, allowing Google and Defendant to benefit.

## X. The Pinterest Tag

114. Defendant installed a tracking pixel on its Website created by the social media site, Pinterest (the "Pinterest Tag").

115. The Pinterest Tag is a piece of code that can be added to a website by a website owner to track visitors on the website and record the actions they take in order to later target these visitors with ads on Pinterest.[62]

116. To make use of the Pinterest Tag, a website owner must include its Pinterest tag ID in its base code.[63]

117. The Pinterest tag ID identifies which code to send to the user's browser to track website owner-designated data points through specified "events."[64]

118. Once a website owner adds the base code of the Pinterest Tag, they can add "event codes" so the Pinterest Tag tracks specific actions visitors take on their websites, such as viewing a page, viewing a video, checking out, and other specified events.[65]

---

[61] Doffman, *Google's Fingerprinting Returns in 8 Weeks and It Will Track Your Devices*, *supra* note 57.

[62] *See Install the Pinterest Tag*, PINTEREST, https://help.pinterest.com/en/business/article/install-the-pinterest-tag (last visited Nov. 2, 2026).

[63] *See Add the Base Code to Your Website*, PINTEREST, https://help.pinterest.com/en/business/article/install-the-base-code (last visited Nov. 2, 2026).

[64] *See Add Event Codes*, PINTEREST, https://help.pinterest.com/en/business/article/add-event-codes (last visited Nov. 2, 2026).

[65] *See id.*

119. The Pinterest Tag begins intercepting user information as soon as the Pinterest Tag loads onto users' browsers.[66]

120. Website owners, like Defendant, then send the collected information to Pinterest. Pinterest recommends that website owners transmit the IP address of website visitors for all conversion events.[67]

121. Without the implementation of any other features, the Pinterest Tag tracks and transmits the URL currently being viewed by the website visitor. Additionally, the Pinterest Tag reads and uses first-party cookies to identify the Pinterest user currently viewing the website through a personalized Pinterest "user ID," even when the user is logged out of Pinterest.[68]

122. Website owners can also, in conjunction with the Pinterest Tag, enable a feature known as "automatic enhanced match" to determine the exact identity of Pinterest users who visit the website.[69]

123. This data can be used by Pinterest to "match more of [a] website['s] visitors and conversions to people on Pinterest, which can lead to improvements in [ad] campaign performance . . . and audience reach."[70]

---

[66] *See Track Conversions with Pinterest Tag*, PINTEREST, https://developers.pinterest.com/docs/track-conversions/pinterest-tag/ (last visited Nov. 2, 2026).
[67] *See Track Conversion Events in the API*, PINTEREST, https://developers.pinterest.com/docs/api-features/track-conversion-events/ (last visited Nov. 2, 2026).
[68] *See View Tag Parameters and Cookies*, PINTEREST, https://help.pinterest.com/en/business/article/pinterest-tag-parameters-and-cookies (last visited Nov. 2, 2026).
[69] *See Enable Automatic Enhanced Match*, PINTEREST, https://help.pinterest.com/en/business/article/automatic-enhanced-match (last visited Nov. 2, 2026).
[70] *Id.*

124. Pinterest uses this data to help advertisers like Defendant gauge the effectiveness of their ad campaigns, optimize the return on their ad spending, and broaden their audience reach.[71]

125. The Pinterest Tag also sends the "tid" parameter, which identifies the website owner's Pinterest Tag ID.[72] Here, the "tid" parameter, found in Pinterest Tag transmissions from Defendant's site, contains Defendant's Pinterest tag ID of 2619248860346. This data is sent both when the Website receives communications and when users send communications to the Website.

126. Additionally, unless websites make use of a specific "Limited Data Processing flag," Pinterest employs this data to conduct research on Pinterest usage and to market its own services.[73]

127. Pinterest also sends the data to its business partners and other vendors.[74] Defendant's use of the Pinterest Tag on the Website is demonstrated below:

---

[71] *See id.*

[72] *See View Tag Parameters and Cookies*, PINTEREST, https://help.pinterest.com/en/business/article/pinterest-tag-parameters-and-cookies (last visited Nov. 2, 2026).

[73] *See Limited Data Processing*, PINTEREST, https://help.pinterest.com/en/business/article/limited-data-processing (last visited Nov. 2, 2026).

[74] *See State Privacy Law Disclosures and Notice at Collection*, PINTEREST (last updated Apr. 2025) https://policy.pinterest.com/en/notice-at-collection (last visited Nov. 2, 2026).




*Figure 20 – The Pinterest Tag intercepting a user's communication on the Website*




*Figure 21 – Information captured by the Pinterest Tag intercepting a user's communication on the Website*




*Figure 22 – Cookies transmitted by the Pinterest Tag on the Website*

128. When a website owner applies to Pinterest to use the Pinterest Tag, the website owner must agree to Pinterest's Developer and API Terms of Service (the "Pinterest Terms"), part of which requires agreeing that Pinterest may collect and use website users' information.[75]

129. The Pinterest Terms further provide Pinterest Tag users, like Defendant, guidance on their responsibilities regarding privacy.

130. Pinterest directs parties implementing the Pinterest Tag, such as Defendant, to clearly disclose their data practices and obtain their users' consent where required by law.[76]

131. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result

[75] *See Developer and API Terms of Service*, PINTEREST, https://developers.pinterest.com/terms/ (last visited Nov. 2, 2026).
[76] *See id.*

from use of the Pinterest Tag, and ignored Pinterest's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' Sensitive Information.

## XI. The Tracking Tools Intercepted and Disclosed Both the Contents of Plaintiff's Communications With the Website, As Well as His Personal Identifiers

132. When Plaintiff researched insurance plans on the Website, entered specific search queries related to Defendant's insurance products and/or services, navigated through specific product and/or service pages, and engaged with interactive site features, the Tracking Tools contemporaneously intercepted Plaintiff's browsing, which is reflected and can be seen in the Transmitted URLs. The path and query string of these Transmitted URLs reflect the substance of a user's communication and therefore constitute content.

133. Each transmission also included unique ID Cookies that identified Plaintiff individually.

134. These transmissions occurred in real time. When Plaintiff submitted information on the Website, the Tracking Tools caused his browser to simultaneously send a duplicate of that communication to the Tracking Entities, which read or attempted to learn its contents while it was in transit.

## XII. Plaintiff Did Not Consent to Defendant's Sharing of His Website Activity

135. Counsel's investigation revealed that the Website's default settings permitted tracking to begin as soon as users arrived on the Website, before users could select "Reject Cookies" or "Accept Cookies" on the Privacy Banner or access "Manage Preferences" to manage their cookie selections.

136. Also, when a user selected "Reject Cookies" and rejected all unnecessary cookies when confronted with the Privacy Banner, Defendant placed, and allowed to be placed, the c_user

cookie from Meta, the _ttp cookie from TikTok, the NID cookie from Google, and the _pinterest_sess cookie from Pinterest, which the Meta Pixel, the TikTok Pixel, Google Ads, and the Pinterest Tag continued to transmit to the Tracking Entities after users rejected all unnecessary cookies.

137. When Plaintiff selected “Reject Cookies” in the Privacy Banner, he relied on Defendant’s representation that all unnecessary cookies would be rejected and continued to browse and use the Website in reliance of that representation.

138. Given the sensitive nature of the information involved, Plaintiff reasonably expected that his communications with the Website were confidential and would not be disclosed to the Tracking Entities.

139. The figures below are exemplar images taken during counsel’s investigation of the Website to show post-rejection tracking and cookies on the Website by an example browser.




*Figure 23 – Post-rejection Meta Pixel on the Website*




*Figure 24 – The Payload of Post-rejection Meta Pixel tracking on the Website*




*Figure 25 – Post-rejection Meta Pixel cookies on the Website*



*Figure 26 – Post-rejection Google PageAd tracking on the Website*




*Figure 27 – The Payload of Post-rejection Google PageAd tracking on the Website*




*Figure 28 – Post-rejection Google PageAd cookies on the Website*




*Figure 29 – Post-rejection TikTok Pixel on the Website*




*Figure 30 – The Payload of Post-rejection TikTok Pixel on the Website*




*Figure 31 – Post-rejection TikTok Pixel's cookies on the Website*




*Figure 32 – Post-rejection Pinterest Tag on the Website*




*Figure 33 – The Payload of Post-rejection Pinterest Tag on the Website*




*Figure 34 – Post-rejection Pinterest Tag's cookies on the Website*

140. This matters because Plaintiff's and the Class members' Sensitive Information has concrete economic value.[77]

141. A well-developed market exists in which consumers are compensated for access to their browsing and online activity data.[78]

[77] *See* Order Denying Google's Mot. for Summ. J. at 33, *Brown v. Google LLC*, No. 4:20-cv-03664-YGR, 2023 U.S. Dist. LEXIS 139895 (N.D. Cal. Aug. 7, 2023) (finding a Google pilot program paying users for access to their browsing history sufficient to establish the existence of a market for users' personal data); *see also* Madison Mills, *Exclusive: Verb Lets You Sell Your Data to AI Labs for Training*, AXIOS (Aug. 6, 2026), https://www.axios.com/2026/08/06/exclusive-verb-lets-you-sell-your-data-to-ai-labs-for-training (last visited Nov. 2, 2026) (describing operations for data exchange marketplace startups Verb, Mercor, and Vana, which enable users to sell personal data as training data); Megan Morrone, *Exclusive: New Wallet App Lets Users Store Their Own Training Data*, AXIOS (Sept. 22, 2025) https://www.axios.com/2025/09/22/ai-training-data-vana-app-mit (last visited Nov. 2, 2026) (similar).

[78] *See* Mills, *supra* note 77; *see also* Morrone, *supra* note 77.

142. By facilitating the Tracking Entities' interception, collection, and transmittal of Plaintiff's Sensitive Information to the Tracking Entities, Defendant took for itself and the Tracking Entities the value of that information without consent or compensation. Defendant also stripped Plaintiff of the ability to decide whether, when, to whom, and on what terms his Sensitive Information would be shared and/or sold.

143. Because Defendant and the Tracking Entities have already obtained Plaintiff's information without authorization, any prospective purchaser of that information would pay less for it, or would not pay for it at all, since the information is no longer exclusive to Plaintiff.

## TOLLING

144. The statutes of limitations applicable to Plaintiff's and Class members' claims are tolled by Defendant's conduct and Plaintiff's and Class members' delayed discovery of their claims.

145. As alleged above, Plaintiff and Class members did not know, and could not have known, when they used the Website, Defendant was disclosing their Sensitive Information to the Tracking Entities without their consent, as well as misrepresenting and disregarding their data sharing preferences. Plaintiff and members of the Class could not have discovered Defendant's unlawful conduct with reasonable diligence, given the highly technical nature of how the Tracking Tools operate.

146. Defendant had exclusive and superior knowledge that the Tracking Tools would disclose Plaintiff's and Class members' Sensitive Information to the Tracking Entities.

147. The earliest Plaintiff and Class members could have known about Defendant's conduct in connection with their investigation and the work done on their behalf in preparation for filing this Complaint was on or about October 26, 2026.

## CLASS ALLEGATIONS

148. Plaintiff brings these claims for relief pursuant to the Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the Class and the California Subclass.

149. Plaintiff brings this class action individually and on behalf of the following Class:

> All persons in the United States who visited the Website during the applicable limitations period and selected "Reject Cookies" on the Website's Privacy Banner or otherwise declined cookies other than Essential Cookies (the "Class").

150. Plaintiff brings this class action individually and on behalf of the following California Subclass:

> All members of the Class who visited the Website during the applicable limitations period while located in the State of California (the "California Subclass").

151. Specifically excluded from the Class are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

152. Plaintiff reserves the right to amend the Class and Subclass definitions above if further investigation and/or discovery reveal that the Class should be expanded, narrowed, further divided into subclasses, or otherwise modified in any way.

153. NUMEROSITY: At this time, Plaintiff does not know the number of Class members but believes the number to be at least measured in thousands, if not millions, given the popularity of Defendant's Website. The number of persons within the Class is believed to be so numerous that joinder of all members is impractical. The exact identities of Class members may be ascertained via the records maintained by the Defendant in the ordinary course of its business.

154. COMMONALITY: Common questions of fact and law exist as to all Class members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between the Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

a. Whether Defendant shared the Class members' Sensitive Information with the Tracking Entities or other third parties and/or facilitated the Tracking Entities' interception of the Class members' Sensitive Information;

b. Whether Defendant obtained effective and informed consent to do so;

c. Whether Defendant's conduct constitutes a violation of the Wiretap Act;

d. Whether Defendant's conduct constitutes unlawful intrusion upon seclusion;

e. Whether Defendant's conduct constitutes fraud;

f. Whether Defendant has been unjustly enriched by its conduct; and

g. Whether the Class members are entitled to actual damages, punitive damages, and/or statutory penalties.

155. Common questions of fact and law exist as to all California Subclass members and predominate over any questions affecting only individual members of the California Subclass. Such common legal and factual questions, which do not vary between the California Subclass members, and which may be determined without reference to the individual circumstances of any California Subclass member, include but are not limited to the following:

a. Whether Defendant's conduct constitutes a violation of the California Invasion of Privacy (the "CIPA"); and

b. Whether Defendant's conduct constitutes a violation of the California Constitution.

156. TYPICALITY: As a person who visited Defendant's Website and whose personal information was shared by Defendant without consent, Plaintiff is asserting claims that are typical of the Class members.

157. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class members or whose inclusion would otherwise be improper are excluded.

158. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class members is impracticable and inefficient. It would be unduly burdensome on the courts, where individual litigation of numerous cases would proceed. If Class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for their wrongdoing as asserted herein.

## CAUSES OF ACTION

### COUNT I
### COMMON LAW INVASION OF PRIVACY
### Intrusion Upon Seclusion
### (On Behalf of Plaintiff and the Class)

159. Plaintiff incorporates by reference and realleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

160. Plaintiff brings this cause of action individually and on behalf of all Class members.

161. Defendant intentionally intruded upon the legally protected privacy interests of Plaintiff and the Class members by, among other things, permitting Tracking Tools to intercept and use users' Sensitive Information by compiling it with other user information gathered across the internet, while representing to users that they could decline such collection.

162. Plaintiff and the Class members maintained a reasonable expectation that their communications with Defendant, including their Sensitive Information, via the Website would remain private.[79] Plaintiff expected that their interactions with the Website would not be shared with the Tracking Entities.

163. Defendant's intrusion, placing the Tracking Tools and enabling the Tracking Entities' access to users' Sensitive Information despite users' express rejection of such tracking, is and would be highly offensive to a reasonable person.

164. Plaintiff and the Class members relied on Defendant's representations and exercised the Website's controls to reject all tracking but strictly necessary cookies, reasonably expecting that Defendant would honor its affirmative representation in the Privacy Banner and Cookie Settings that users could decline unnecessary cookies.

165. Despite Plaintiff's and the Class members' affirmative rejection of unnecessary cookies, Defendant permitted the Tracking Entities to use cookies and the Tracking Tools to collect and compile users' Sensitive Information, including the categories described above. The

[79] For example, California voted to pass the California Consumer Privacy Act of 2018 (the "CCPA") and voted to amend the CCPA in 2020 through Proposition 24, the California Privacy Rights Act (the "CPRA" ). The CPRA sets out that collecting and using "personal information," including real names, online identifiers, internet browsing and search history, location data, audio and visual information, etc., requires businesses to provide adequate notice of such practices. *See generally* Cal. Civ. Code §§ 1798.100, 1798.105, 1798.106, 1798.110, 1798.115, 1798.120, 1798.140(v).

Tracking Entities used and profited from these data to create detailed user profiles, audience segments, and targeted advertising, and to share and monetize those profiles.

166. Defendant lacked any legitimate business justification for permitting the placement and transmission of third-party cookies and Tracking Tools that allowed the Tracking Entities to access, intercept, and collect users' Sensitive Information, contrary to users' express selections and rejection of consent.

167. As a direct and proximate result of Defendant's conduct, Plaintiff and the Class members suffered injury, including, but not limited to, loss of privacy, loss of control over their personal information, diminution in the value of their private data, and other compensable harms.

168. Plaintiff and the Class members seek all available relief for this claim, including compensatory damages, restitution, disgorgement of profits, and punitive damages where available.

## COUNT II
## INVASION OF PRIVACY AND VIOLATIONS OF THE CALIFORNIA CONSTITUTION, Art. I, § 1
### (On Behalf of Plaintiff and the California Subclass)

169. Plaintiff incorporates by reference and realleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

170. Plaintiff brings this cause of action on behalf of himself and all California Subclass members.

171. Plaintiff and the California Subclass members have a legally protected interest in their Sensitive Information.

172. Plaintiff and California Subclass members' protected interests arise from various statutes and common law, including, *inter alia*, the Wiretap Act, the CIPA, and the California

Constitution, which protects privacy rights and includes the "ability to control circulation of personal information."[80]

173. Plaintiff's and the California Subclass members' privacy rights were invaded through the interception and collection of their data, including their Sensitive Information, without first obtaining authorization or consent from Plaintiff and the California Subclass members.

174. Plaintiff and the California Subclass members had a reasonable expectation of privacy when communicating with Defendant's Website and thereby providing and/or transmitting their Sensitive Information. By causing third-party cookies and other Tracking Tools to be placed on users' browsers and devices and by transmitting users' Sensitive Information to the Tracking Entities despite users' selections to reject all tracking but strictly necessary cookies, Defendant violated their reasonable expectation of privacy.

175. Defendant's intrusion, placing the Tracking Tools and enabling the Tracking Entities' access to users' Sensitive Information despite users' express rejection of such tracking, is and would be highly offensive to a reasonable person.

176. As a direct and proximate result of Defendant's intentional invasion of their privacy rights, Plaintiff and the California Subclass members have been harmed and are entitled to compensatory and punitive relief.

[80] Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972) argument in favor of Prop. 11, at 27.

**COUNT III**
**VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Penal Code § 631**
**(On Behalf of Plaintiff and the California Subclass)**

177. Plaintiff incorporates by reference and realleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

178. Plaintiff brings this cause of action on behalf of himself and all California Subclass members.

179. CIPA provides that a person is liable to another where, "by means of any machine, instrument, or contrivance, or in any other manner," committed any of the following: (i) intentionally tapped, or made any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system; or (ii) willfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or being sent from or received at any place within this state; or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv) aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section. Cal. Penal Code § 631(a).

180. The Website, the Tracking Tools, and Plaintiff's devices and browsers each qualify as a "machine, instrument, or contrivance, or . . . other manner" used to engage in the prohibited conduct at issue. Cal. Penal Code § 631(a).

181. Within the relevant time period, the Tracking Entities, through the use of the Tracking Tools, without the consent of all parties to the communication, or in any unauthorized manner, willfully read or attempted to read or learn the contents or meaning of electronic communications of Plaintiff and the California Subclass members, contemporaneous with the communications transiting through or passing over any wire, line or cable or with the communications sent from or being received at any place within California.

182. The information collected by the Tracking Tools was not for the sole benefit of Defendant. Within the relevant time period, Defendant aided, agreed with, and employed the Tracking Entities to accomplish the wrongful conduct at issue here.

183. As a direct and proximate result of Defendant's conduct, Plaintiff and the California Subclass members suffered losses and were damaged in an amount to be determined at trial. CIPA imposes civil liability and statutory penalties for violations of Cal. Penal Code § 631. *See* Cal. Penal Code § 637.2.

**COUNT IV**
**VIOLATIONS OF THE WIRETAP ACT 18 U.S.C. § 2510 et seq.**
**(On Behalf of Plaintiff and the Class)**

184. Plaintiff incorporates by reference and realleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

185. Plaintiff brings this cause of action on behalf of himself and all Class members.

186. The federal Wiretap Act prohibits the intentional interception of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. *See* 18 U.S.C. § 2511.

187. The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

188. The Wiretap Act defines "contents" as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

189. The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

190. The Wiretap Act defines "person" to include "any individual, partnership, association, . . . trust, or corporation." 18 U.S.C. § 2510(6).

191. Plaintiff, Defendant, and the Tracking Entities are "person[s]" within the meaning of the Wiretap Act.

192. The Tracking Tools, Plaintiff's devices and browsers, and Defendant's website server constitute "device[s]" or "apparatus[es]" capable of intercepting wire, oral, or electronic communications within the meaning of 18 U.S.C. § 2510(5).

193. Plaintiff had a reasonable expectation of privacy in his electronic communications with Defendant's Website, including the pages he viewed, browsing activity, and other interactions with Website features, particularly where Defendant represented through its Privacy Banner and Cookie Settings that users could reject non-required cookies.

194. During the relevant time period, the Tracking Tools intercepted the contents of Plaintiff's electronic communications with the Website while those communications were in transit and transmitted them to the Tracking Entities, all without Plaintiff's consent. The Tracking Entities intercepted these communications to monetize them, including by combining them with information the same Tracking Tools collected about Plaintiff across the Internet and using the combined data for advertising, analytics, and marketing optimization.

195. At all relevant times, Defendant's conduct was knowing, willful, and intentional. Defendant is a sophisticated commercial entity that knowingly embedded and enabled the Tracking Tools on its Website and understood that doing so would result in the interception and transmission of users' communications to the Tracking Entities.

196. Plaintiff did not consent to the interception, recording, disclosure, or use of his electronic communications with the Website by the Tracking Entities. To the contrary, Plaintiff affirmatively rejected the Tracking Entities' tracking through Defendant's Privacy Banner.

197. The unauthorized interception and use of Plaintiff's electronic communications by the Tracking Entities were only possible because Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Website. *See* 18 U.S.C. § 2511(1)(a).

198. Defendant intentionally procured the Tracking Entities' interception of the contents of Plaintiff's and the Class members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state.

199. Defendant engaged in such conduct for unlawful and tortious purposes, including, for example, invasion of privacy, and associating the content of Plaintiff's and the Class members' electronic communications with preexisting consumer profiles and using the contents of their electronic communications in a manner that exceeds what Defendant promised Plaintiff and the Class members on its Website.

200. Defendant intentionally used the wire or electronic communications to increase its profit margins and for financial gain.

201. Additionally, Plaintiff's communications were fraudulently disclosed and were obtained and used based on misrepresentations to Plaintiff through the Privacy Banner.

202. As a direct and proximate result of Defendant's violations of the Wiretap Act, Plaintiff has been damaged and is entitled to relief under 18 U.S.C. § 2520, including:

a. damages in an amount to be determined at trial, assessed as the greater of the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation, or

b. statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000; and

c. a reasonable attorney's fee and other litigation costs reasonably incurred.

**COUNT V**
**COMMON LAW FRAUD, DECEIT, AND/OR MISREPRESENTATION**
**(On Behalf of Plaintiff and the Class)**

203. Plaintiff incorporates by reference and realleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

204. Plaintiff brings this cause of action individually and on behalf of all Class members.

205. Defendant made affirmative representations to users through its Privacy Banner and Cookie Settings that users could decline non-necessary cookies.

206. Defendant represented that exercising those options would limit or prevent the deployment of Tracking Tools, including "Advertising Cookies," and would limit the transmission of users' Sensitive Information to the Tracking Entities.

207. Defendant made these representations at the time users first accessed the Website and again when users were prompted to review and confirm their cookie preferences.

208. These representations were false and misleading. After users, including Plaintiff and the Class members, clicked "Reject Cookies," Defendant deployed the Meta Pixel, the

TikTok Pixel, Google Ads, and the Pinterest Tag to intercept and collect Plaintiff's and the Class members' Sensitive Information and transmit the same to the Tracking Entities.

209. Defendant knew the representations were false or misleading, or acted with reckless disregard for their truth, because Defendant controlled the Website's source code, selected and configured the Tracking Tools, and determined how those tools operated in relation to users' expressed privacy choices. Defendant also received reports on the Tracking Tools functionality, which would have alerted Defendant to decreased information intake if the Website's Privacy Banner and Cookie Settings were functioning as described and stopped transmitting data when users rejected cookies.

210. Defendant had the technical ability to prevent data transmissions and to configure the Website so that non-essential tracking ceased when users declined such tracking. Industry-standard tools, configurations, and consent-management frameworks exist that permit websites to block, defer, or condition the loading of non-essential Tracking Tools based on users' preferences, and Defendant could have implemented such measures.

211. Defendant made misrepresentations with the intent to induce reliance by users, including Plaintiff, by reassuring them that they could meaningfully control tracking while Defendant continued to collect and transmit data for its own commercial benefit.

212. Plaintiff and the Class members reasonably and justifiably relied on Defendant's misrepresentations by continuing to use the Website and by affirmatively rejecting all but strictly necessary cookies instead of avoiding the Website, withholding information, or taking additional steps to protect their privacy.

213. Plaintiff's and the Class members' reliance was reasonable because Defendant presented the Privacy Banner and Cookie Settings as mechanisms for exercising legally protected privacy rights and for controlling the collection and sharing of personal information.

214. As a direct and proximate result of Defendant's fraudulent conduct, Plaintiff and the Class members suffered damages, including loss of privacy, loss of control over their personal information, and diminution in the value of their personal data. Plaintiff and the Class members suffered injury, including unauthorized disclosure of their communications, loss of control over their personal information, and loss of the privacy protection Defendant represented it would provide.

215. Defendant's conduct also resulted in Defendant obtaining an unjust and improper benefit by continuing to collect, use, and monetize users' Sensitive Information despite representing that such practices would cease upon users' declination and/or rejection of consent.

216. Plaintiff and the Class members seek all available relief for Defendant's fraudulent conduct, including compensatory damages, restitution, disgorgement, and punitive damages where available.

**COUNT VI**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

217. Plaintiff incorporates by reference and realleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

218. Plaintiff brings this cause of action on behalf of himself and all Class members.

219. Defendant obtained a benefit by collecting, processing, and enabling third-party monetization of Plaintiff's and the Class members' Sensitive Information, which Defendant then used to increase the effectiveness of advertising, marketing, and sales and to generate revenue.

220. It is unjust that Defendant retains those benefits under circumstances in which the Sensitive Information was collected and transmitted without valid consent.

221. Plaintiff and the Class members conferred these benefits on Defendant, and Defendant has been unjustly enriched at the expense of Plaintiff and the Class members. Equity and good conscience require restitution or disgorgement of the benefits unjustly retained by Defendant.

222. There is no remedy at law that will address this harm, as monetary damages will not capture or account for the wrongful profit or benefit that Defendant received from exploiting Plaintiff's and Class members' Sensitive Information.

## PRAYER

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, seeks judgment against Defendant, as follows:

a. For an order determining that this action is properly brought as a class action, certifying the Class and the California Subclass, and certifying Plaintiff as the representative of the Class and the California Subclass and his counsel as Class Counsel;

b. For an order finding in favor of Plaintiff, the Class and the California Subclass, on all counts asserted herein;

c. An award of statutory damages or penalties to the extent available;

d. An award of punitive damages to the extent available;

e. For damages in amounts to be determined by the Court and/or jury;

f. For pre-judgment interest on all amounts awarded;

g. For an order of restitution and all other forms of monetary relief;

h. An award of all reasonable attorneys' fees and costs; and

i. Such other and further relief as the Court deems necessary and appropriate.

**DEMAND FOR TRIAL BY JURY**

Plaintiff demands a trial by jury of all issues so triable.

Dated: November 6, 2026

Respectfully Submitted,

*/s/ John D. Blythin*
John D. Blythin (SBN 1046105)
Shpetim Ademi (SBN 1026973)
**ADEMI & FRUCHTER LLP**
3620 E. Layton Ave.
Cudahy, WI 53110
Telephone: (414) 482-8000
Facsimile: (414) 482-8001
Email: jblythin@ademilaw.com
Email: sademi@ademilaw.com

Mark S. Reich*
Christopher V. DeVivo*
**LEVI & KORSINSKY LLP**
33 Whitehall Street, 27th Floor
New York, New York 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
Email: cdevivo@zlk.com

**pro hac vice* forthcoming

*Attorneys for Plaintiff and the Proposed Classes*